Batten v. The State.

No. 10,084.

BATTEN v. THE STATE.

COURTS.—*Terms.*—*Statute Construed.*—The act of March 5th, 1881, fixing the time and terms of court in the circuit composed of the counties of Bartholomew and Brown, fixes a term in Bartholomew to begin on the third Monday in November, to sit seven weeks if the business require it, and in Brown on the first Monday of January. In 1881 the term of seven weeks in Bartholomew did not expire at the time thus named for the January term in Brown to begin.

*Held,* that the January term in Brown was required to begin at the time named in the statute, and the November term in Bartholomew could sit only six weeks.

SAME.—*Adjournment.*—The circuit court can sit in regular term only at the time fixed by law, and during the period allotted as the term in one county, it can not sit in another county of the same circuit in regular term; nor does adjournment shorten the term so fixed, it only stops the business.

SAME.—*Jurisdiction.*—If a court sit in regular term in one county during the time fixed by law for the term in another county of the same circuit, its proceedings can not be sustained.

CRIMINAL LAW.—*Murder.*—*Evidence.*—*Witness.*—*Experts.*—*Cross-Examination.*—In a trial for murder, a surgeon may testify to his opinion of the character of a wound, and, having so testified in chief, he may be cross-examined upon the same subject.

Batten *v.* The State.

SAME.—A witness in a murder case, who has testified about the dressing of wounds of the deceased, can not be asked on cross-examination whether one of the surgeons who dressed the wound was drunk.

SAME.—A medical witness who has, in such case, testified to the treatment of the deceased, may be asked on cross-examination as to the effect of certain medicines administered by him.

SAME.—A surgeon who, in such case, has described the wound and given his opinion of its character, and who treated the deceased, may be asked on cross-examination whether, at the time of treatment, he supposed that the intestines were severed by a knife used by the accused.

SAME.—*Evidence of Flight.*—In a prosecution for murder, the flight of the prisoner may be proved against him, and he may prove, to account for such flight, the manner of the persons present towards him, and that they followed and threatened him with violence.

SAME.—*Instructions.—Reasonable Doubt.*—In a criminal case, it is error to instruct the jury, that " as moral certainty does not embrace absolute certainty, on the other hand, a reasonable doubt does not include every possible doubt that might exist in the field of man's speculation. These terms are used in an effort to convey to the understanding that state of the mind wherein convictions are formed conscientiously upon a basis which all thoroughly disciplined judgments will concur in, and no pure conscience will disapprove."

SAME.—A reasonable doubt may arise as well from lack of evidence as from the evidence itself.

SAME.—*Instruction.*—In a prosecution for murder, it is error to instruct that it is admitted that the prisoner cut and stabbed the deceased and inflicted the wound; therefore, to constitute the *corpus*, it only remains for the jury to find from the evidence that that wound was in itself fatal.

SAME.—*Self-Defence.*—In a.trial for murder, instructions professing to cover the whole subject of self-defence, which do not even intimate that the right of self-defence may extend to the taking of human life, are erroneous, if there was evidence before the jury from which it might have been inferred that there was, at the time of the homicide, such appearances as might have impressed the prisoner with a reasonable apprehension of great bodily harm, unless he resorted to extreme measures to avert it.

SAME.—The right to take life in self-defence is not dependent upon the fact that *a man of ordinary prudence* would, under the circumstances, apprehend immediate and urgent danger, but upon the fact that the *accused himself* was really and reasonably so impressed by the appearances.

PRACTICE.—*Evidence.*—That the rejection of evidence may be made available error, there should be a statement of what it will be, unless the question propounded indicates its character and materiality. On cross-examination the rule is otherwise.

From the Bartholomew Circuit Court.

*G. W. Cooper, W. W. Browning* and *A. M. Cunning*, for appellant.

*D. P. Baldwin*, Attorney General, *W. W. Thornton* and *W. Dixon*, Prosecuting Attorney, for the State.

ELLIOTT, C. J.—On the 26th day of October, 1881, the grand jury of Brown county returned an indictment against the appellant, charging him with murder in the first degree. The appellant, on the 6th day of January, 1882, filed a plea in abatement, wherein it is alleged, in substance, that the case was continued from the October term of the Brown Circuit Court, until the January term; that it was set down for trial on the 3d day of January, 1882; that the appellant was confined in jail, and was not in court when the case was continued; that he did not consent to such continuance; that the Brown Circuit Court had no jurisdiction to try the case, for the reason that the law provides that the court in Bartholomew county shall commence on the first Monday in February, fourth Monday in April, the first Monday in September, and the third Monday in November, in each year, and shall continue seven weeks; that the November term of the Bartholomew Circuit Court began on the 21st day of November, 1881, and that seven weeks would not expire until the 7th day of January, 1882; that, by the provisions of the statute, the terms of the Bartholomew Circuit Court precede those of the Brown Circuit Court. A demurrer was sustained to this plea. In other methods, the question of the jurisdiction of the Brown Circuit Court was presented below and is presented here.

It appears from the court's record, as well as from the appellant's plea, that when the appellant objected to the jurisdiction of the Brown Circuit Court, the time designated by the statute for the November term of the Bartholomew Circuit Court had not fully elapsed.

The act of March 5th, 1881, contains the following provision : "The terms of said court, in the Ninth Circuit, shall be held in the county of Bartholomew, on the first Monday in

Batten *v.* The State.

February, the fourth Monday in April, the first Monday in September, and the third Monday in November of each year; and in the county of Brown, on the first Monday in January, the first Monday in April, the third Monday in June, and the fourth Monday in October of each year. The courts in the county of Bartholomew shall continue seven weeks, and in the county of Brown three weeks, at each term, if the business thereof requires it."

It is well settled that the term of court must be held at the times fixed by law. *McCool* v. *The State*, 7 Ind. 378; *Smithson* v. *Dillon,* 16 Ind. 169. It is also settled that a court must transact business during the term. *Newman* v. *Hammond*, 46 Ind. 119; *Ferger* v. *Wesler*, 35 Ind. 53. If, therefore, the Brown Circuit Court was not legally in session at the time the appellant was arraigned, and at the time he entered his plea, there was no valid arraignment. Where there is not a valid arraignment, the judgment must be reversed.

The statute fixes the term of the Bartholomew Circuit Court at seven weeks, and this constitutes the term. The fact, that the court may not sit during the entire term, does not shorten the term; that remains as fixed by statute. The adjournment stops the business of the court, but it does not abridge the term. It is true that there can not be two courts in one circuit in session, at the same time, in regular term. The judge is not authorized to appoint other times for regular terms than those authorized by law, nor can he shorten or lengthen the term prescribed. The court may be adjourned before the end of the term, but the adjournment does not abridge the term; that the judge can not do. If the court in the county of Brown was held during the regular term prescribed for Bartholomew, its proceedings were without warrant of law, and can not be sustained.

Counsel for the State cite us to *Brock* v. *Gale*, 14 Florida, 531. We have not been able to find the case, but find it cited in Wells on Jurisdiction, in support of the statement that, "Where, by mistake, a law requires court to be held in two

places in the circuit, on the same day, it is in the discretion of the judge to select which one he will hold; and under this election the proceedings will be valid." We can not assent to this doctrine. A judge has no power to fix terms of court; this must be done by statute. Attorneys and litigants have a right to know at what time a regular term of court begins. They are not bound to abide by the discretion of the judge in selecting which of two uncertain dates he may choose. Such a rule as that contended for by the State would clash with the long settled rule of this court that judicial knowledge is taken of the terms of the circuit courts of the State. *Buckinghouse* v. *Gregg*, 19 Ind. 401; *McGinnis* v. *The State*, 24 Ind. 500; *Roberts* v. *Masters*, 40 Ind. 461.

The day fixed for the commencement of the Brown Circuit Court is a certain one. There can be no doubt that the Legislature intended that the court should commence on that day. The commencement of the term is a matter of high importance; writs, bonds and notices are prepared, issued and served with reference to the first day of the court. At common law all orders and judgments were referable to the first day. We must presume that the Legislature recognized the necessity of accurately and certainly fixing the first day of the term, and that it was a leading and controlling purpose in the enactment of the statute. It was much easier to have erred in the computation of the time necessary to give the Bartholomew court seven weeks than to have made a mistake in naming the time on which the court in Brown county should begin. We must, therefore, presume that the error was in allotting too much time to the former court, rather than in fixing the first day of the latter. It is much more likely that the inadvertence, which causes the conflict, occurred in calculating the length of the November term of the Bartholomew court than that it happened in fixing the day upon which another court in the same circuit should commence its term.

Litigants and officers have no other guide for determining when courts shall commence than that supplied by the stat-

ute.  The commencement of the term should not be left in doubt, and we feel clear that the Legislature never meant there should be any doubt as to the commencement of the court in Brown county.  We do no violence certainly to the intentions of the framers of the statute, and very little to the language, in holding that the time fixed for the opening of the Brown Circuit Court controls, and that the period of seven weeks fixed for the length of the term in Bartholomew county must give way.  In doing this we promote the public good, and make certain the transactions of the former court. It is much better that the November term of the latter court should be abridged one week, than that there should be no time at all designated for the January term of the former. No great harm can result from taking one week from the November term of the Bartholomew court, but great confusion and perplexity may arise from leaving the time of holding the Brown Circuit Court in doubt and uncertainty.

We conclude that the Brown Circuit Court was lawfully in session at the time the appellant was arraigned, and that the demurrer to his plea was properly sustained.

The State was permitted, over the appellant's objection, to ask a surgeon whether the wound received by the deceased was or was not a mortal one.  There was no error in this.  A surgeon may give his opinion as to the character of a wound.

Appellant asked a medical witness upon cross-examination, whether the wound was necessarily a fatal one.  The witness had already expressed an opinion, in answer to questions asked by the prosecution, as to the character of the wound, and it was competent for the accused to cross-examine upon the same subject.

The appellant asked to be allowed to propound to a witness on cross-examination the question whether one of the surgeons who dressed the wound of the deceased was drunk, but the court refused to permit this to be done.  We do not regard this ruling as erroneous.  It was proper to cross-examine as to what the surgeon did, what course of treatment

he pursued, but we do not think the appellant had any right to enter, upon cross-examination, into such a collateral matter (affecting not the witness himself, but another,) as that indicated by his question.

Dr. Ralpha had testified as to the treatment of the deceased, and the appellant on cross-examination asked him as to the effect of certain medicines which had been administered, but the court refused to permit the question to be answered. The appellant had a right to show, if he could, that death did not result from the wound. If medicine of an improper character was used, or if proper medicine was improperly administered, and death was caused solely by such means, the appellant had a right to make it appear. As the witness was introduced as an expert, and had testified as to matters of opinion, the accused had a right to test his skill as an expert by questions legitimately connected with the matters about which he had testified upon his examination in chief. *Davis* v. *The State*, 35 Ind. 496 ; *Frenzel* v. *Miller*, 37 Ind. 1.

In the course of the cross-examination of the same witness the appellant's counsel asked if at the time he, Dr. Ralpha, treated the deceased, he was under the impression that his intestines were severed by the knife used by the appellant. This question was proper upon cross-examination. The witness had described the wound, had stated his opinion of its character, and had spoken of its treatment. The question was directed to the subject of the examination in chief, and was an enquiry upon a material point. It was material as tending to exhibit the degree of skill possessed by the expert, and as tending to explain the cause of death.

A party cross-examining a witness is not required to state what evidence he expects to elicit by his question. The rule which applies to direct examinations does not apply to cross-examinations.

There was no error in admitting evidence of the appellant's flight. It is proper to show that one accused of crime fled to

avoid arrest. The competency of such testimony is one thing; its value quite another and distinct thing.

The evidence shows that one Moore had attempted to provoke a fight with the appellant before Hester, the deceased, came upon the ground where the fatal rencounter took place. It is clear to our minds, that this quarrel was so connected with the combat which ended in the death of the deceased, that it formed part of the *res gestœ*. The court ought to have permitted the appellant's witnesses to state their version of this quarrel. The questions asked by counsel upon this subject were proper. There was, however, no formal offer of evidence, nor any statement of what the witnesses would testify to, and there is, therefore, no available error. It is established by many cases, that unless the form of the question discloses the character and materiality of the evidence sought to be elicited, the party calling the witness must make a statement of what he expects the testimony to prove.

The appellant asked witnesses introduced by the State, what the manner of the throng of persons upon the ground was, and whether they followed him up threatening violence. We need not stop to enquire whether what was done by these persons an instant after the blow was struck was or was not a part of the *res gestœ*, for it was clearly competent upon another ground. It was competent for the purpose of aiding the jury in properly determining the weight to be attached to the circumstance of the appellant's flight. What inference shall be drawn from such an act depends in a very great degree upon the circumstances surrounding the accused. Dr. Wharton says: " In all cases the circumstances explaining or excusing flight are to be taken into consideration." Whart. Crim. Ev., section 750.

The court instructed the jury at great length. One hundred and twenty-one instructions were given. There is more than a grain of truth in the suggestion of the counsel that such a great volume of instructions was likely to bewilder and mis-

lead the ordinary juror. But, passing this point, we turn to some of the instructions against which objections are most earnestly pressed.

The 12th instruction is as follows : " But as moral certainty does not embrace absolute certainty, on the other hand, a reasonable doubt does not include every possible doubt that might exist in the field of man's speculation. These terms are used in an effort to convey to the understanding that state of the mind wherein convictions are formed conscientiously, upon a basis which all thoroughly disciplined judgments will concur in, and no pure conscience will disapprove."

This instruction asserts an erroneous doctrine. It is not enough that the conclusion reached be one in which " thoroughly disciplined judgments will concur, and no pure conscience will disapprove." The juror who decides a civil case acts conscientiously, and upon a basis which the judgment approves. All men who do right and act justly, act in obedience to judgment and conscience. Good men do this in the every-day business of life. A far higher requirement is imposed where life or liberty are in jeopardy. In such cases there must not only be a conscientious belief of guilt, but there must be a conscientious conviction that there is no reasonable doubt of guilt. Jurors may often conscientiously believe an accused person to be guilty, and yet be not convinced to that degree of certainty which the law requires.

The 13th instruction is in conflict with the rule declared in the cases of *Densmore* v. *The State,* 67 Ind. 306, and *Wright* v. *The State,* 69 Ind. 163. A reasonable doubt may arise from lack of evidence as well as from evidence. In the first case referred to it is said : " And it is not the law, as we think, that a reasonable doubt may not be raised upon the conjecture of the defendant's innocence, though there is nothing in the ' evidence adduced ' that furnishes a foundation for, or suggestion of, the conjecture."

The 32d instruction is as follows : " It is admitted in this case that the deceased was cut and stabbed, and that the de-

fendant inflicted the wound ; therefore, to constitute the *corpus,* it only remains for you to determine from the evidence in the case, whether that wound was or was not in and of itself fatal." This instruction ought not to have been given.  The body or substance of a felonious homicide is not the mere act of striking a blow from which death results.  The body of such a crime is made up of many more essential elements.  The act, the evil mind, the fatal result, all must be present to constitute " the substance or whole of the crime."  It was incumbent upon the State to do much more than prove the blow and its result.  It was error to tell the jury that as the stabbing was admitted, it only remained for them " to determine from the evidence in the case, whether the wound was or was not in and of itself fatal."  Much more than this was required of the State in order to establish the crime with which the accused was charged.  Wharton's Crim. Ev., section 325.

Twelve instructions were given upon the subject of self-defence.  It is complained that in all of them there is an improper statement of the law, for the reason that in none of them is there a declaration or intimation that the right of self-defence extends to the taking of human life.  We have carefully examined the instructions and there appears to us to be just grounds for complaint.  Not one of the instructions declares that an assailant's life may be taken by one who is in peril of suffering great bodily harm or of losing his life.  There is a studied avoidance of this branch of the rule.  All the authorities agree that the right of self-defence extends to the killing of an assailant where the circumstances are such as excuse or justify resort to such extreme measures.  There was evidence in the present case from which it might have been inferred that there were reasonable appearances of grievous bodily harm and which might have created a reasonable apprehension of such harm, unless resort was had to extreme measures.  We do not say, nor mean to say, that the jury should have yielded to this evidence ; we go no further than to affirm that there was evidence requiring that the law of

self-defence should have been stated in the usual and approved form.    Whether an instruction is or is not proper, does not depend upon the weight or importance of the evidence.    Where an accused offers evidence tending to prove a state of facts to which a settled principle of law is applicable, the instructions should declare that principle.    This is so in all cases where the instructions profess to fully cover the whole ground, and to state all the essential elements of a crime or defence.    If the instructions do not assume to completely state the law upon the subject, but are mere general statements of leading principles and are correct as far as they go, then the defendant must ask for a more specific instruction upon the subject which he desires presented to the jury.    *Colee* v. *State*, 75 Ind. 511 ; *McClary* v. *State*, 75 Ind. 260.

In all of the instructions which touch upon the point, the trial court declares that the appearances of danger must be such as would create in the mind of a man of ordinary prudence an apprehension of immediate and urgent danger.    An ideal man is thus made the standard by which the guilt or innocence of the accused is to be determined.    Is this correct? Should not the standard be the man himself ?    Ought regard to be had to real things, the man, the situation, the surroundings, or should some imaginary person be taken as the guide ? There is some conflict in the cases.    Our conclusion is that the question must be decided upon the appearances present to the eyes and mind of the accused himself, and upon the belief actually and in good faith entertained by him.    Ultimately, the question whether there were appearances reasonably indicating great and immediate peril, and whether they did actually inspire the accused with the honest belief of urgent and pressing danger, is to be decided by the jury.    But the court is not to set up, as the standard by which the appearances are to be measured or the belief tested, an ideal man.    In cases involving life, actual, real things rather than ideal should be taken as standards and tests.    It is much safer and better to take the real man, the actual situation, and the real surround-

ings. There is not, of course, to be any enquiry as to whether he was a brave man or a coward, nor are any kindred matters to be investigated.

After a very full and careful review of the authorities, Wharton says: "Viewing the law in this respect on principle, we are compelled to hold that the question of apparent necessity can only be determined from defendant's standpoint." Whart. Homicide, section 520. Elsewhere this author says: "And that this ideal reasonable man is an inadequate standard is shown by a conclusive test. Suppose the ideal reasonable man would at the time of the conflict have believed that a gun aimed by the deceased was loaded, whereas in point of fact the defendant knew the gun was not loaded; would the defendant be justified in shooting down an assailant approaching with a gun the defendant knows to be unloaded, simply because the ideal ' reasonable man ' would suppose the gun to be loaded? No doubt that in such case no honest belief of the ideal reasonable man would be a defence to the defendant who knew that the belief was false, and that he was not really in danger of his life. And if the belief of the ideal reasonable man is not admissible to acquit, a fortiori, it is not admissible to convict." Whart. Homicide, section 494. Bishop's statement of the rule is: "If the person assaulted, being himself without fault, reasonably apprehends death or great bodily harm to himself, unless he kills the assailant, the killing is justifiable." 1 Crim. Law, section 865. See, also, Harris' Crim. Law, 129, auth. n. This statement has been approved in express terms by this court. Kingen v. The State, 45 Ind. 518; Presser v. The State, 77 Ind. 274. In Regina v. Thurborn, 1 Den. C. C. 387, it was said: "The guilt of the prisoner must depend on the circumstances as they appear to him." In Pond v. The People, 8 Mich. 49, and Hurd v. People, 25 Mich. 405, this doctrine is declared and enforced, the court, in the latter case, saying that it is a principle "of natural justice which must never be overlooked." The doctrine is thus tersely stated by the Supreme Court of Iowa: "The inquiry is, was the

danger actual to the defendant's comprehension; not whether the danger existed in fact, not whether injury was actually intended by the deceased, but was it evident or actual to the prisoner as compared with danger remote or problematical." *The State* v. *Neeley,* 20 Iowa, 108.   Many cases are cited by Wharton sustaining the rule declared by him, and to them may be added *Coffman* v. *Commonwealth,* 10 Bush Ky. 495; S. C., 1 Am. Crim. R. 293; *The State* v. *Martin,* 30 Wis. 216.   While the precise point here discussed has not been directly presented to this court, yet there runs through all our cases a recognition of the rule that the belief of the accused, as formed from the appearances present to his vision and mind, are those by which the question of his guilt or innocence must be determined. The cases already cited reveal this. In *Hicks* v. *The State,* 51 Ind. 407, it was said: " When his " (the accused's) " life is in danger, or he is in danger of great bodily harm, or when, from the acts of the assailant, he believes, and has reasonable ground to believe, that he is in danger of losing his life or receiving great bodily harm from his adversary, the right to defend himself from such danger, or apprehended danger, may be exercised by him, and he may use it to any extent which is reasonably necessary." In the opinion of the court, delivered by NIBLACK, J., in *Runyan* v. *The State,* 57 Ind. 80, it was said: "It seems to us, that the real question in the case, when it was given to the jury, was, was the defendant, under all the circumstances, justified in the use of a deadly weapon in repelling the assault of the deceased? We mean by this, did the defendant have reason to believe, and did he in fact believe, that what he did was necessary for the safety of his own life or to protect him from great bodily harm?"

Very many other points are made against the instructions, but we do not find it necessary to consider them, as the case must be again tried.

Judgment reversed; clerk is directed to issue the proper order for the return of the appellant.